Santokh **TAKHAR**, D.V.M., Plaintiff–Appellant,

v.

David A. **KESSLER**, M.D., individually and in his capacity as Commissioner of Food and Drug, Department of Health and Human Services, et al., Defendants–Appellees.

No. 94–15605.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted October 19, 1995.

Decided Feb. 12, 1996.

George A. McKray, San Francisco, California, for plaintiff-appellant.

Patricia J. Kenney, Assistant United States Attorney, San Francisco, California, for defendants-appellees.

Before: SCHROEDER, FLETCHER and RYMER, Circuit Judges.

## OPINION

FLETCHER, Circuit Judge:

Santokh Takhar, a California-licensed veterinarian with a large-animal practice, challenges two Food and Drug Administration (FDA) Compliance Policy Guides (CPG) as exceeding the agency's statutory mandate by regulating veterinarians' extra-label drug use. He claims they contravene Congressional intent to exempt the practice of veterinary medicine from the Food, Drug and Cosmetic Act (FDCA). He also challenges the CPGs as substantive rules that were adopted without the notice-and-comment procedures required by the Administrative Procedure Act. The district court dismissed Takhar's suit for lack of standing and ripeness. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## BACKGROUND

### A. Extra–Label Drug Use in Animals

"Extra-label" drug use consists of using a drug in a manner not indicated on the FDA-approved manufacturer's label; this can include the use of a drug for a condition, in a dosage, or in an animal species for which the drug has not received FDA approval. The plaintiff asserts that extra-label drug use is common in veterinary medicine because no FDA-approved drugs exist for many diseases in many species; about 30,000 drugs have been approved for human use, while only about 2,000 drugs have been approved for animal use.

By at least 1977, the FDA took the position that while extra-label drug use by veterinarians was technically illegal under the FDCA, its Bureau of Veterinary Medicine did not object to such use in non-food-producing animals as long as the veterinarian legally obtained the drug and had no approved alternative drug available, and as long as the use posed no obvious hazard to the animal's health. CPG 7125.18, September 22, 1977. The FDA stated that extra-label drug use by veterinarians in food-producing animals was not sanctioned and was the responsibility of the veterinarian, and advised that it would take regulatory action where such use resulted in illegal drug residues in edible animal tissue. *Id.*

In 1984, the FDA revised its compliance policy and issued CPG 7125.06 regarding extra-label use of animal drugs in food-producing animals.[1] CPG 7125.06 announced that a

1. The FDA issued CPG 7125.06 on March 9, 1984 and revised it on May 1, 1984; August 1, 1986; November 1, 1986; and July 20, 1992. *See* 49 Fed.Reg. 20,915 (May 17, 1984) (an-

finding of illegal drug residues in food would no longer be a prerequisite to regulatory action against extra-label drug use by veterinarians. "Nevertheless," the agency stated, "extra-label drug use in treating food-producing animals may be considered by a veterinarian when the health of animals is immediately threatened and suffering or death would result from failure to treat the affected animals." The agency then provided criteria and precautions for such extra-label drug use and announced that as long as those criteria were met and those precautions followed, the FDA "would not ordinarily" consider regulatory action against veterinarians' extra-label drug use. The current version of those criteria and precautions provides that regulatory action will not ordinarily be considered where:

1) a medical diagnosis is made by an attending veterinarian within a valid veterinarian-client-patient relationship;

2) no approved drug or dosage is available to treat the condition effectively in the animals affected;

3) the animals treated are carefully identified;

4) an extended withdrawal period is assigned and observed before the marketing of food produced by the animal and no illegal residues occur in the food; and

5) the extra-label drug is adequately labelled by the prescribing veterinarian.

CPG 7125.06, July 20, 1992.

In addition, the FDA indicated that certain drugs could not be used in food-producing animals even when the outlined criteria and precautions were met and followed. The 1984 CPG specified that such drugs included chloramphenicol and DES, and the 1992 version of CPG 7125.06 lists use of seven additional types of drugs in food-producing animals as among the highest-priority extra-label drug uses for regulatory attention. With respect to chloramphenicol, the FDA went further and in 1986 withdrew approval of chloramphenicol oral solution for animal

use. 50 Fed.Reg. 27,059 (July 1, 1985) (notice of proposed regulation); 51 Fed.Reg. 1,367 (final rule withdrawing approvals).

In 1991, the FDA issued CPG 7125.35 regarding the use of human drugs in animal medicine.[2] The agency noted that most such use occurs in non-food pets and that "[m]any of the maladies of pets cannot be treated in accordance with current standards of veterinary practice without the use of human drugs since veterinary versions of many human drugs do not exist". CPG 7125.35, March 19, 1991. Concern was expressed about increasing promotion and distribution of human drugs for use in, and actual use of such drugs in, food-producing animals. The criteria and precautions in CPG 7125.06 for extra-label animal-drug use in food-producing animals were incorporated by reference to guide enforcement of extra-label human-drug use in such animals, and the FDA announced its intent to take aggressive regulatory action to discourage such use, while stating that extra-label human-drug use in non-food-producing animals would not ordinarily prompt regulatory action. The current version of CPG 7125.35 specifies that food-animal veterinarians should consider extra-label human-drug use only when:

1) a medical diagnosis is made by an attending veterinarian within a valid veterinarian-client-patient relationship;

2) no approved drug or dosage is available to treat the condition effectively in the animals affected; and

3) adequate steps are taken to prevent illegal residues from occurring in food.

CPG 7125.35, July 20, 1992. Even when these criteria and precautions are met and followed, the agency stated that it would consider regulatory action if an illegal residue occurred in food because of the extra-label drug use.

On October 22, 1994, after briefing in this case but before oral argument, the Animal Medicinal Drug Use Clarification Act of 1994 became law. Pub.L. No. 103–396, 1994 U.S.C.C.A.N. (108 Stat.) 4153. The Act

nouncing availability of CPG 7125.06); 57 Fed. Reg. 33,964 (July 31, 1992) (announcing availability of most recent revision of CPG 7125.06).

2. CPG 7125.35 was issued on March 19, 1991 and revised on July 20, 1992.

amended the FDCA to allow extra-label use of approved drugs in the practice of veterinary medicine in accordance with regulations to be promulgated by the Secretary of Health and Human Services. The Act's amendments to the FDCA will take effect when the Secretary adopts final regulations, which are due by October 22, 1996 but which have not yet been proposed.

### B. Takhar's Prior Conviction

In June 1986, Takhar was indicted on one count each of misbranding and adulterating new animal drugs in violation of 21 U.S.C. §§ 331(k) and 333(a); his veterinary partner, Wesley A. Jacobs, was indicted for the same violations as well as for one count of making false statements to an FDA investigator in violation of 18 U.S.C. § 1001. The indictments were based on 1984 investigations by the FDA into the purchase and use of chloramphenicol in Takhar's and Jacobs' practices. The indictments were dismissed by the district court for prosecutorial misconduct; the government appealed to this court, which reversed and remanded the case with instructions that it be reassigned. *United States v. Jacobs*, 855 F.2d 652 (9th Cir.1988).

On remand, in January 1989, the judge to whom the case had been reassigned denied Takhar's Motion to Dismiss Indictment in Part, in which Takhar asserted that as a licensed veterinarian he was exempt under 21 U.S.C. §§ 353(b)(2) and 360(g)(2) from certain registration, labelling, and prescription requirements, and that the FDA had banned the use of chloramphenicol in food-producing animals without proper notice or opportunity to comment. In October 1989 Takhar pled guilty to one count of misbranding new animal drugs and was sentenced to three years probation, 300 hours of community service, and a $1,000 fine. An Order Terminating Term of Supervised Release/Probation Prior to Expiration Date was entered on July 12, 1991.

### C. Proceedings Below

On July 16, 1993, Takhar filed a Complaint for Declaratory Judgment and Injunctive Re-

lief against FDA officials, including David Kessler, M.D. and Gerald Guest, D.V.M.[3] Takhar asked the court (1) to declare that licensed veterinarians are exempt from certain registration, labelling, and prescription requirements under 21 U.S.C. §§ 360(g)(2) and 353(f) when using prescription drugs solely in the course of their professional practices; (2) to declare that the FDA lacked the authority to prosecute veterinarians for violating provisions of the CPGs regarding specific drugs because the agency failed to follow notice-and-comment procedures in promulgating the CPGs; and (3) to enjoin the FDA from enforcing CPG 7125.35 in violation of the alleged practice-of-medicine exemption. On September 14, 1993, the defendants moved to dismiss the complaint for lack of subject-matter jurisdiction and failure to state a claim; on October 22 the district court dismissed the complaint, with leave to amend, for lack of subject-matter jurisdiction. On November 29, Takhar filed a First Amended Complaint seeking similar relief. On December 10, the defendants moved again to dismiss for lack of subject-matter jurisdiction and failure to state a claim. After a hearing in January 1994, the district court dismissed the First Amended Complaint for lack of ripeness and standing.

### STANDARDS OF REVIEW

Standing is a question of law reviewed de novo, *Barrus v. Sylvania*, 55 F.3d 468, 469 (9th Cir.1995), as is ripeness, *Dodd v. Hood River County*, 59 F.3d 852, 857 (9th Cir. 1995).

### DISCUSSION

■ The Supreme Court has recently given detailed guidance on questions of standing in the administrative realm.

[T]he irreducible constitutional minimum of standing contains three elements: First,

---

**3.** While Takhar's Complaint and First Amended Complaint name these officials in both their official *and* individual capacities, Takhar's counsel has stated that he does not intend this to be a *Bivens* action against the officials.

the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations and footnote omitted). A plaintiff has the burden of establishing the elements required for standing, and "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party". *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Judged by these standards, Takhar's allegations of injury from fear of prosecution; from his prior conviction; from lack of notice of, and opportunity to comment on, the CPGs; and from his use of gentamicin cannot withstand the motion to dismiss; neither can his allegations of general injury to his ability to practice.

*Fear of Prosecution*

██ Takhar alleges he fears prosecution by the FDA for extra-label drug use in the course of his veterinary practice, but his allegations do not set forth any concrete or actual threat of prosecution. For example, Takhar alleges that *if* he were to prescribe legally obtained antibiotics in post-surgical care of food-producing animals, he *could* be prosecuted for extra-label drug use. He does not, however, allege that he has used such antibiotics or that any use he might make of these drugs would fall outside of the CPG criteria for non-enforcement and thus trigger a possibility of prosecution.

Similarly, Takhar alleges that *were* he to use chloramphenicol, he *could* be convicted of a felony, and *were* he unaware of the chloramphenicol ban and *were* he to violate it, he would be open to prosecution. He is, however, clearly aware of the FDA's position on the use of chloramphenicol in food-producing animals and he does not allege that he uses chloramphenicol. Takhar also alleges injury stemming from the burden of knowing he might be subject to prosecution for extra-label drug use, but such knowledge cannot constitute a legally cognizable injury in fact sufficient to confer standing.

Even if Takhar's allegations of fear of prosecution stated sufficient injuries in fact for standing purposes, those injuries are not caused by the CPGs that he challenges. It is the FDCA itself that requires FDA approval for every intended use of an animal drug and that bars extra-label use, 21 U.S.C. §§ 360b(a)(1), 351(a)(5). It is also the FDCA that deems human drugs used by veterinarians in treating animals to be misbranded and/or adulterated. 21 U.S.C. §§ 352(f), 351(a)(5). Congress recognized the statutory nature of the bar on extra-label veterinary use of drugs; indeed, that recognition motivated the passage of the 1994 animal-drug clarifications. *See* 140 Cong.Rec. S14,071 (Oct. 4, 1994) (statement of Sen. Heflin) ("Due to an unintended consequence of legislation passed nearly 30 years ago, whenever a veterinarian uses an approved animal drug other than in strict accordance with its label, he or she is breaking the law."); *id.* (statement of Sen. Pressler) ("Current law prohibits the use of an animal drug for purposes other than those listed on the drug's label."); 138 Cong.Rec. E1585 (May 28, 1992) (remarks of Rep. Stenholm). The CPGs are merely the FDA's statements of its priorities in using its limited resources to enforce the statutory ban on veterinary extra-label drug use.

██ Takhar alleges that if he were prosecuted again for extra-label drug use, he would be subject to felony penalties and to a fine up to five hundred times greater than that he faced in his previous prosecution.

While this fact would increase the severity of injury to Takhar if he were facing a threat of prosecution, the possible consequences of a criminal violation by Takhar do not confer standing on him to challenge the CPGs in the absence of a showing that he faces any concrete threat of enforcement. Takhar also alleges that he suffered three years of legal vulnerability while awaiting clarification from the FDA regarding its policy regarding gentamicin, which he began to use in cattle, even though such use is extra-label, when the FDA began to investigate Takhar's and Jacobs' practice for use of chloramphenicol. While it is regrettable that the FDA did not respond to Takhar's inquiries more promptly, he has now received the "clarification" that CPG 7125.06 accurately states the agency's policy on extra-label use of gentamicin, and therefore does not suffer any continuing uncertainty. The uncertainty that Takhar experienced while waiting for clarification from the FDA is not an injury in fact sufficient to confer standing on Takhar to challenge the CPGs.

### Takhar's Prior Conviction

■ Takhar's complaints can be read to allege at least two injuries related to his prior conviction. First, he alleges that the FDA failed to bring to the second trial court's attention, and the court failed to take into account, 1988 amendments to the FDCA that Takhar claims support his reading of the Act as exempting veterinarians from certain FDCA requirements. Second, he alleges injury from allegedly improper inspection of his records by the FDA, apparently in the course of the investigation leading to the 1986 indictment. Even if we assume that these were injuries in fact, they are not redressable by this court. The proper avenue for seeking redress for these injuries was in the district court, or appeal to this court, at the time of Takhar's conviction, or through a petition for habeas corpus before Takhar was released from probation. As Takhar did not appeal his conviction and has been released from his probation, this court would be unable to remedy any injury he may have suffered in his prior conviction.

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976) (injury must be "likely to be redressed by a favorable decision").

### Takhar's Use of Gentamicin

■ Takhar alleges that after the FDA promulgated CPG 7125.06 declaring that no use of chloramphenicol in food-producing animals would be tolerated, he substituted gentamicin, a more expensive and less effective drug, for chloramphenicol in his practice. Although Takhar nowhere alleges that his extra-label use of gentamicin fails to meet the criteria and precautions set forth in CPG 7125.06, and as long as his use does conform to those guidelines and no illegal drug residues occur in food the FDA would not ordinarily consider enforcement action against him, he has alleged that CPG 7125.06 has caused him to change his day-to-day practice of veterinary medicine to his detriment, since he alleges that gentamicin is less effective and more expensive than chloramphenicol. Thus, Takhar has alleged an injury in fact for standing purposes. The cause of any injury to Takhar, however, is not the CPG but the FDCA itself because, as discussed above, the statute prohibits extra-label use and Takhar would be liable for statutory violations even in the absence of the CPG.

### Lack of Notice and Opportunity to Comment

■ Takhar alleges that he had no notice of, or opportunity to comment on, the FDA's issuance and revision of CPG 7125.06, especially the listing of nine particular drugs whose use in food-producing animals would receive the agency's highest-priority regulatory attention. An agency's failure to provide notice of, and opportunity to comment on, proposed regulations can constitute an injury in fact for standing purposes if, in seeking enforcement of notice-and-comment requirements, a plaintiff is "seeking 'to enforce a procedural requirement the disregard of which could impair a separate concrete interest'". *Yesler Terrace Community Council v. Cisneros*, 37 F.3d 442, 446 (9th Cir.1994), quoting *Lujan*, 504 U.S. at 572,

112 S.Ct. at 2142. As a veterinarian, Takhar has a strong claim of a concrete interest in FDA policy on enforcement of veterinary extra-label drug use.

The lack of notice and comment, however, does not constitute an injury to Takhar because the FDA was not required to provide notice and comment in issuing these CPGs. The Administrative Procedure Act (APA) generally requires notice-and-comment procedures for the issuance of rules other than "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice". 5 U.S.C. § 553(b)(A). Because the CPGs are "interpretive" rules or policy statements, they are exempt from the notice-and-comment procedure.

This court has distinguished between the two types of rules as follows: "Substantive rules are those which effect a change in existing law or policy. Interpretive rules are those which merely clarify or explain existing law or regulations." *Powderly v. Schweiker,* 704 F.2d 1092, 1098 (9th Cir.1983) (citation omitted). In determining into which category to place a particular rule, the court "must inquire into the substance and effect of the policy pronouncement", *Anderson v. Butz,* 550 F.2d 459, 463 (9th Cir.1977). The CPGs that Takhar challenges are interpretive rules because they do not create any obligations or rights with respect to extra-label veterinary drug use. It is the FDCA itself that makes such use illegal. The challenged CPGs merely set forth which instances of such illegal use the FDA is likely to view as requiring it to take enforcement action and which instances, while technically violative of the statute, will not ordinarily be subject to enforcement action. Thus, these CPGs do not "effect a change in existing law or policy", *Powderly,* 704 F.2d at 1098, but rather explain how the FDA will use its limited resources in enforcing existing law. *See Professionals and Patients for Customized Care v. Shalala,* 56 F.3d 592, 596 n. 27 (5th Cir.1995) (court determination that one CPG was interpretive rule not determinative with respect to different CPG; distinguishing *Southeastern Minerals, Inc. v. Harris,* 622

F.2d 758 (5th Cir.1980) (FDA's CPG was not invalid for lack of notice-and-comment procedures)). Because these CPGs are interpretive rules, the FDA was not required by the APA to use the notice-and-comment procedures in promulgating them, so Takhar was not injured by denial of notice and the opportunity to comment.

One further allegation by Takhar regarding notice and comment does not constitute a cognizable standing injury. Takhar alleges that if he were to fail to hear of a change in a CPG made without notice or comment, he would be vulnerable to prosecution. However, the FDA's regulations governing compliance policy guides, 21 C.F.R. § 10.85, protect Takhar from injury through changes in the CPG without notice. Section 10.85(e) provides that "[t]he Commissioner may not recommend legal action against a person or product with respect to an action taken in conformity with [a CPG] which has not been amended or revoked" except, as § 10.85(f) provides, "[i]n unusual situations involving an immediate and significant danger to health". Section 10.85(g) provides that a CPG "may be amended or revoked at any time" but that notice of such action "will be given in the same manner as notice of the [CPG] was originally given or in the *Federal Register*". Since notice of the 1992 versions of both CPG 7125.06 and 7125.35 was published in the Federal Register, no change in them can be made, except in an emergency, without notice in the Federal Register. Thus, Takhar is in no danger of being prosecuted because of a change in the CPGs of which he has no notice.

*General Injury to Ability to Practice*

Takhar alleges that he is caught between his professional obligations as a veterinarian and the FDA rules regarding extra-label drug use. He has not, however, offered any explanation at all of how his professional obligations require him to engage in extra-label drug use that does not conform to the criteria and precautions set forth in the FDA's guidelines. *Cf. Cowdin v. Young,* 681

 

F.Supp. 366, 368 (W.D.La.1987) (rejecting veterinarians' challenge to CPG 7125.06 for lack of standing and ripeness because they failed to demonstrate how the CPG constituted unauthorized intrusion in day-to-day veterinary practice).

## CONCLUSION

Takhar's allegations do not state an injury in fact caused by the CPGs he challenges, so the district court's dismissal of the complaint for lack of subject matter jurisdiction was proper. Because we conclude that Takhar lacks standing to challenge the CPGs, we do not reach the question of whether his claims are ripe. The judgment of the District Court is

AFFIRMED.